IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID MANNARINO, Jr.,
    Plaintiff,
v.
SHAUN EDMEDSTUDSON (EDMUDSON),
DAVID YURISH (URISH), LLOYD
RODGERS, and FRANCIS BAILEY,
    Defendants

Case No. 3:11-cv-201-KRG-KAP

Summary Report and Recommendation

Defendants Francis Bailey, Shaun Edmudson, Lloyd Rodgers, and David Urish filed a motion for summary judgment at docket no. 41, to which plaintiff has not filed a response despite being advised that his failure to do so would be grounds for dismissal of his complaint for failure to prosecute. I recommend that summary judgment be granted to defendants. Even if summary judgment on the merits were not appropriate, under the rubric established in <u>Poulis v. State Farm Fire and Casualty Co.</u>, 747 F.2d 863, 868 (3d Cir.1984), the complaint against defendants should be dismissed (without prejudice but with costs assessed as a sanction) for failure to prosecute.

On the evening of April 14, 2011, Mannarino was incarcerated at the Blair County Prison as a pretrial detainee. In his deposition, Mannarino described the incident of excessive force that he alleges violated his rights under the Eighth and Fourteenth Amendments. He was in cell E-18 with three cellmates, Mannarino depo. at 17, when a cell search was announced, and Mannarino and his cellmates were ordered to leave the cell. Mannarino, who had already spent time in Pennsylvania's state

prison system, objected that "upstate" inmates were allowed to watch cell searches. Mannarino depo. at 23. The corrections officers replied that they could do whatever they wanted. After the search Mannarino returned to his cell, and about ten minutes later defendants Bailey, Edmudson, Rodgers, and Urish came back and ordered him to cuff up because they had found contraband (tobacco and a razor blade) in his cell and were going to take him to the RHU. Mannarino depo. at 27-28. Mannarino believed that the contraband was planted by a fellow inmate that Mannarino had previously been celled with in the RHU. Mannarino depo. at 31.

When they arrived at the RHU, Mannarino objected to Rodgers that Rodgers was grabbing his arm too hard and was bending him forward by raising Mannarino's hands that were cuffed behind Mannarino's back. Mannarino was also objecting to being taken to the RHU, telling the corrections officers "please don't make me contact my lawyer over something so petty and stupid." Mannarino depo. at 35. Rodgers responded "we'll see how much you want to contact your lawyer when we get you to the RHU," "or something down that line." Mannarino depo. at 36. Mannarino had had no previous problem with Rodgers and believed that there was no animosity between them. Mannarino depo. at 62-63. No one else said anything. When they eventually arrived at the RHU, with Mannarino still bent forward, Rodgers hit Mannarino in the face just below the right eye with the palm of his right hand. Mannarino depo. at

2

44-46. Mannarino believes Rodgers hit him three or possibly four (but not five) times in rapid succession on his face below his right eye. From Mannarino's description Rodgers' hand traveled less than a foot for each slap. Mannarino depo. at 49-50. They proceeded into the RHU cell, and Rodgers said something Mannarino does not recall, Mannarino depo. at 58, then put his right arm around Mannarino's neck and then leaned back, straightening Mannarino up and forcing him up onto his toes. Mannarino depo. at 58. Mannarino surmised that Rodgers was ineffectually trying to choke him and Mannarino "started laughing so hard because he was trying to hurt me but it didn't work so I started laughing so he let me go." Mannarino depo. at 59.

Mannarino continued to ask "why is all this going on" when Rodgers grabbed the back of Mannarino's shirt and pushed Mannarino forward, tripping him over Rodger's leg to "where I would fall on my chest and like on my stomach and stuff face down." Mannarino depo. at 57. Mannarino described this as "a flinging motion" in which Rodgers used both hands to take him to the ground, with Rodgers' left hand on Mannarino's chest and right hand on Mannarino's back. Mannarino depo. at 71-72. Mannarino recognized the move as a "tactic to where they use if someone's not being compliant or someone's fighting and they have to stop and take them down to handcuff them." Mannarino depo. at 72. Mannarino began screaming when his face "hit" the floor. Mannarino depo. at 57.

3

Rodgers ordered the other corrections officers to strip Mannarino of his clothes and they did so, with Rodgers placing his shod right foot on the left side of Mannarino's face and holding it there as Mannarino lay on the ground. Mannarino depo. at 68. That lasted from half a minute to a minute. Mannarino depo. at 77-78. Mannarino continued screaming without words as two of the other corrections officers (but not Bailey, see Mannarino depo. at 76) stripped his clothes off. At some point they stood Mannarino up and Rodgers unhandcuffed him, and all four of the corrections officers left. Mannarino claimed that the other corrections officers could have stopped Rodgers from taking any of the actions complained of but admitted that Rodgers never said anything to indicate what he was going to do; Mannarino assumed that the other defendants "could have" been aware of Rodgers' actions before he took them because "they're all coworkers." Mannarino depo. at 73; see also Mannarino depo. at 74.

There was another inmate already in the RHU cell when Mannarino arrived but the corrections officers had told him to face the wall so that he would not observe anything. Mannarino depo. at 80-82. Mannarino asked the inmate, Patrick O'Shea, who was scheduled to be released soon, if he would testify on Mannarino's behalf and O'Shea, although he witnessed the incident, declined to get involved allegedly because he was scheduled to be released and didn't want any trouble. Mannarino depo. at 83-85.

After the corrections officers left, Mannarino screamed for approximately five minutes until an inmate block worker, Scotty Lecomte, came to Mannarino's cell and Mannarino asked him to contact his mother to contact Mannarino's grandmother to report what happened, and also to get a corrections officer. Mannarino depo. at 88-89. About twenty minutes later a corrections officer, Sergeant Grill (as per Exhibit 3) or Grew (as per the deposition) came to Mannarino's cell, heard his story, told Mannarino not to be a pussy, and left. Mannarino depo. at 91-93. Mannarino continued to yell until another passing inmate, Michael Lattieri (or Latieri per the defendants' brief or Lateary as per the deposition), stopped and asked if Mannarino were okay. Mannarino depo. at 94. Finally, the nurse bringing medications to the RHU stopped at Mannarino's cell escorted by Sergeant Grill, and the nurse later that night brought Mannarino some ice and Tylenol. Mannarino depo. at 97-98. Mannarino did not tell the nurse what happened because he was "so frustrated." Mannarino depo. at 98. Mannarino does not recall receiving the misconduct citation that same night, but did receive a misconduct citation at some point. Mannarino depo. at 100.

The next morning Mannarino, after breakfast, reported the incident to Barrie Wyland (a captain per the defendants' brief and spelled Wieland in the deposition), and Wyland took photographs of Mannarino's face and had Mannarino write out a statement.

Mannarino depo. at 101-02. Later that day Mannarino was transferred to the Cambria County Prison. Mannarino depo. at 104. Mannarino does not believe that anything further was done about his attempt to bring criminal charges against the corrections officers. Mannarino heard that the police concluded that any injury Mannarino had was self-inflicted, and his guess was that O'Shea gave a false statement to that effect. Mannarino depo. at 101-04.

Mannarino's injuries were a puffy black eye that lasted four days, and what he believes may have been a boot print on his face until the next day. Mannarino depo. at 106-07. He recalled receiving more Tylenol and having his face x-rayed at the Blair County Prison at about 9:00 a.m. on the morning of the 15th but never heard what the results of that were. The x-ray report, reporting "no bone or soft tissue damage" was attached as an exhibit to the deposition. He recalls the medical personnel at Cambria County telling him he had a black eye. Mannarino depo. at 108-111. Mannarino did not tell anyone at Cambria County about Rodgers' actions because he feared retaliation. Mannarino depo. at 111.

The Supreme Court established the limits on the permissible use of force to maintain or restore discipline in a prison environment in Whitley v. Albers, 475 U.S. 312 (1986). In that case, the plaintiff inmate Albers was deliberately shot in the left knee by a corrections officer armed with a shotgun during an

attempt to rescue a corrections officer who had been taken hostage. The Supreme Court, even assuming that shooting Albers was unnecessary, held that because the officer with the shotgun may have thought that Albers constituted a threat to the hostage the defendants were not liable for Albers' injuries. 475 U.S. at 324-26. The Supreme Court adopted as its standard language from Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033 (1973): prison personnel are not liable for injuries from uses of force applied in good faith, but are liable for force used "maliciously and sadistically for the very purpose of causing harm." 475 U.S. at 320-21. Merely "unreasonable" uses of force do not violate the Constitution. 475 U.S. at 324. Whether a corrections officers is acting maliciously or sadistically must be inferred from objective evidence, and even improper uses of force must rise "to the level of a constitutional dimension" because:

There exists some point at which the degree of force used is so minor that a court can safely assume that no reasonable person could conclude that a corrections officer acted maliciously and sadistically.

Reyes v. Chinnici, 54 Fed.Appx. 44, 48 (3d Cir.2002). See Smith v. Mensinger, 293 F.3d 641, 648-49 (3d Cir.2002), quoting Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir.2000)(factors to be considered include the need for use of force, the relationship between the need and the amount of force used, the extent of injury inflicted, the threat to staff and other inmates perceived by the corrections officers, and any efforts made to temper the severity of the force

used). In general, an unprovoked assault, e.g. Wilkins v. Gaddy, 559 U.S. 34 (2010)(Wilkins asked corrections officer Gaddy for a grievance form and Gaddy punched, kicked, kneed, and choked Wilkins) and retaliatory beatings, Smith v. Mensinger, 293 F.3d 641 (3d Cir.2002)(inmate's head rammed into walls and cabinets, then inmate kicked, punched, and choked) presents genuine questions of fact for a jury. Minor or even major uses of force that someone in hindsight may claim to have been greater than strictly necessary or even inappropriate do not violate the Eighth Amendment (or Fourth Amendment or Fourteenth Amendment). Whitley v. Albers, supra, 475 U.S. at 325 (defendant's failure to make special provision for inmate instead of shooting him "may have been unfortunate" but not a basis for liability). See also Carson v. Mulvihill, 488 Fed. Appx. 554 (3d Cir.2012)(affirming summary judgment to corrections officer who "launched" a wheelchair-bound inmate into a steel bunk to return him to his cell); and Reyes v. Chinnici, supra (affirming summary judgment in favor of a corrections officer after assuming that a jury could have found the officer punched a handcuffed prisoner even after noting that all three corrections officers deposed had opined that punching a handcuffed inmate can never be an acceptable use of force.)

Here, using only Mannarino's own testimony, the defendants were taking an admittedly lawful action - a cell search- when they admittedly found contraband, including a potential

8

weapon. Whether or not Mannarino's theory that it was planted on him is true, taking Mannarino to the RHU pending further investigation or disciplinary hearing is a normal step in the disciplinary process. Mannarino's own testimony is that he then kept up a chatter on the way to the RHU objecting about why he was being taken to the RHU, about what did the corrections officers find, about how he would have to contact his attorney as a consequence of what he expressly labeled as "something so petty and stupid."

It goes without saying that although it is the use of force and not the injury sustained that must be the focus of inquiry, examining Mannarino's allegations of injury sheds light on whether the use of force was improper. Mannarino at the utmost describes his injury (and the medical report confirms it) as a black eye or a bruised face. That is impossible to reconcile with a sadistic and malicious attempt to injure Mannarino. I do not even need to discuss Mannarino's own description of some of Rodger's efforts, if they were designed to inflict injury, as literally an occasion for laughter. Mannarino says he suffered three or four quick open-palmed slaps, then was lowered to the floor, then was held down with a booted foot while he was being stripped. Accepting this as true, the officers could plausibly conclude that it was a faster and more efficient process to strip and unhandcuff Mannarino without waiting for his cooperation.

Whatever the reason for the slaps, what Rodgers did immediately afterward, as Mannarino recognized in his deposition, was a controlled take down move, with one hand above and one hand below Mannarino's chest, followed by Rodgers lowering him to the ground. In what Mannarino described as a small double cell with a bunk bed, a toilet, and a sink, Mannarino went to the ground without hitting anything. Next, in what may have been an embarrassing affront to Mannarino, Rodgers allegedly put a foot on Mannarino's cheek to keep him from getting up during the process of stripping Mannarino's clothes off, but Rodgers did not stomp, kick, punch, or do anything else to Mannarino during this thirty to sixty seconds.

Rodgers was not required by the Constitution to avoid affronting Mannarino's dignity, or to wait for Mannarino to take off his clothes voluntarily, or even to ask Mannarino for his cooperation. See e.g. Smith v. Hulick, 1998 WL 84019 (E.D.Pa. February 25, 1998), aff'd w/o op. 208 F.3d 206 (3d Cir.2000)(no liability where inmate began to disobey the order of a corrections officer, whereupon corrections officer grabbed inmate's shoulder, spun him around, and punched him in the face; when the inmate began to run, corrections officer tackled him and injured inmate's shoulder.)

As for the other officers, they are clearly in this matter only on a theory that they failed to intervene to stop

Rodgers. But as the circuit has noted, the corrections officers must be in a reasonable position to intervene. Smith v. Mensinger, supra, 293 F.3d 650-51. While the usual question for examination is how to intervene, the initial question here is "to intervene in what?" Each of the three actions Rodgers allegedly took was over in seconds and independent of the previous actions. As for the slaps, Mannarino described them as three, maybe four slaps in quick succession. Assuming the other three corrections officers realized immediately after the first slap that Rodgers was intending to violate Mannarino's rights, by Mannarino's own description they could not have reacted fast enough to stop the next two slaps. With no realistic opportunity to intervene, the other officers could not be liable even if Rodgers announced aloud that his intention was to violate Mannarino's rights. As for Rodgers' actions in taking Mannarino down to the floor and controlling him by keeping his head down simply by applying pressure, if it was not proper corrections technique it was close enough to it[1] to make the other corrections officers' lack of intervention (assuming they

---

1. I am not opining on corrections techniques, I am saying that objectively speaking, it was a *de minimis* use of force and therefore could not have been recognized by the other defendants as a situation requiring intervention. Mannarino testified that the boot was on the left side of his face, yet complained to the medical department that it was the right side of his face that hurt. Obviously if Rodgers had stepped on Mannarino or ground the sole of his shoe on Mannarino it would have resulted in damage to the left side of Mannarino's face. Rodgers did not even exert enough pressure that Mannarino had to stop his continuous screaming.

could have intervened in the take down without causing injury to Mannarino) not even close to a question of fact for a jury.

Summary judgment should be entered for all defendants.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have fourteen days to serve and file written objections to this Report and Recommendation.

DATE: 11 February 2014

Keith A. Pesto,
United States Magistrate Judge

Notice to counsel of record by ECF and by U.S. Mail to:

David Mannarino LH-2013
S.C.I. Coal Township
1 Kelley Drive
Coal Township, PA 17866-1021